## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

HONORHEALTH DEER VALLEY MEDICAL
CENTER
19829 N. 27th Avenue
Phoenix, AZ 85027

and

HONORHEALTH JOHN C. LINCOLN
MEDICAL CENTER
d/b/a Scottsdale Lincoln Health Network, John
C. Lincoln Hospital - North Mountain, John C.
Lincoln North Mountain Hospital, Scottsdale
Healthcare Hospitals, John C. Lincoln Health
Network, SHC John C. Lincoln North Mountain
250 East Dunlap Avenue
Phoenix, AZ 85020

and

HONORHEALTH SCOTTSDALE OSBORN
MEDICAL CENTER
d/b/a Scottsdale Healthcare Hospitals, Scottsdale
Lincoln Health Network, SHC Osborn Medical
Center, Osborn Medical Center
7400 E. Osborn Road
Scottsdale, AZ 85251

and

HONORHEALTH SCOTTSDALE SHEA
MEDICAL CENTER
d/b/a Scottsdale Healthcare Hospitals, Scottsdale
Lincoln Health Network, SHC Shea Medical
Center
9003 E. Shea Boulevard
Scottsdale, AZ 85260

and

MAYO CLINIC ARIZONA
d/b/a Mayo Clinic Hospital
5777 East Mayo Boulevard
Phoenix, AZ 85054

Case No. 1:26-cv-00168

and

MAYO CLINIC FLORIDA
d/b/a Mayo Clinic Jacksonville
4500 San Pablo Road
Jacksonville, FL 32224

and

MAYO CLINIC HEALTH SYSTEM -
SOUTHWEST MINNESOTA REGION
d/b/a Mayo Clinic Health System Mankato
1025 Marsh Street
Mankato, MN 56001

and

MAYO CLINIC HEALTH SYSTEM -
SOUTHWEST WISCONSIN REGION
d/b/a Mayo Clinic Health System Franciscan
Healthcare Inc. La Crosse
700 West Avenue South
La Crosse, WI 54601

and

MAYO CLINIC HEALTH SYSTEM EAU
CLAIRE HOSPITAL
d/b/a Mayo Clinic Health System in Eau Claire
1221 Whipple Street
Eau Claire, WI 54702

and

MAYO CLINIC HOSPITAL ROCHESTER
d/b/a Mayo Clinic Health System Rochester
1216 Second Street Southwest
Rochester, MN 55905

and

MILTON S. HERSHEY MEDICAL CENTER
d/b/a Penn State Health Milton S. Hershey
Medical Center
500 University Drive
Hershey, PA 17033

and

ST. JOSEPH REGIONAL HEALTH
NETWORK
d/b/a St. Joseph Medical Center
2500 Bernville Road
Reading, PA 19603

      Plaintiffs,

v.

ROBERT F. KENNEDY, JR.,
in his official capacity as
Secretary of the United States
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

      Defendant.

## COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY RELIEF AND SUMS DUE UNDER THE MEDICARE STATUTE

### INTRODUCTION

1.     The above-captioned Plaintiffs bring this civil action to obtain judicial review of agency decisions regarding Medicare reimbursements rendered by Robert F. Kennedy, Jr. (the "Secretary" or "Defendant") in his official capacity as the Secretary of the United States Department of Health and Human Services.

2.     The Medicare statute provides for payments for two types of hospital costs on a prospective payment basis, specifically, operating and capital related costs. 42 U.S.C. § 1395ww(d), (g). At issue is a type of capital cost payment.

3.      In addition to a per discharge capital cost payment, the Secretary may provide a capital adjustment "to take into account variations in the relative costs of capital and construction for the different types of facilities or areas in which they are located." 42 U.S.C. § 1395ww(g)(1)(B)(ii). The Secretary did in fact adopt such an adjustment, known as the capital disproportionate share hospital ("DSH") adjustment. However, in 2006, the Secretary promulgated a regulation that denied that adjustment to certain hospitals, for reasons that had no relation to their costs. *See* 42 C.F.R. § 412.320(a)(1)(iii).

4.      This 2006 rule affected only hospitals that elected to acquire "rural" status for purposes of the operating cost prospective payment methodology.

5.      The Secretary had no authority under the applicable statute to adopt and implement this regulation. Plaintiffs seek an order setting aside the Secretary's regulation at 42 C.F.R. § 412.320(a)(1)(iii) and its application against the Plaintiff providers, which unlawfully reduces Plaintiffs' capital payments by denying them a capital DSH adjustment.

6.      The Secretary's adoption and application of this regulation violates the plain language and purpose of the Medicare statute and the Administrative Procedure Act ("APA").

7.      Accordingly, Plaintiffs ask this Court to reverse the Secretary's final agency decisions and to order the Secretary to recalculate Plaintiffs' capital DSH payments as required by statute.

8.      Lastly, Mayo Clinic Eau Claire (as defined in Paragraph 12 below) challenges the ruling of the Provider Reimbursement Review Board ("PRRB" or "Board") in Case No. 25-0191GC that the hospital failed to comply with the substantive claim requirements at 42 C.F.R. § 413.24(j). The Board's decision is unsupported by substantial evidence, arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority, and must

therefore be overturned.

## JURISDICTION AND VENUE

9.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare statute"), which establishes the Medicare program, and the APA, 5 U.S.C. § 551 *et seq.*

10.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f)(1), which grants Medicare providers the right to obtain expedited judicial review ("EJR") of any action involving "a question of law or regulations relevant to the matters in controversy" when the Secretary's Provider Reimbursement Review Board (the "Board") "determines . . . that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received." The Board granted EJR to Plaintiffs in decisions dated November 25, 2025, and January 6, 2026. Accordingly, this action is timely filed within the sixty-day period established at 42 U.S.C. § 1395oo(f)(1). Plaintiffs have exhausted all administrative remedies prior to commencing this action.

11.      Venue in this Court is proper under 42 U.S.C. § 1395oo(f)(1).

## PARTIES

12.      The Plaintiffs in this action are Medicare participating hospitals. They are listed below with their Medicare provider numbers and their cost reporting periods at issue in this action, as set forth in their administrative appeals[1]:

a) HonorHealth Deer Valley Medical Center ("Deer Valley Medical Center"), Provider No. 03-0092 for fiscal year ending December 31, 2021;

---

[1] As hospital names may have changed over the years, a hospital may be definitely identified by its Medicare provider number.

b)  HonorHealth John C. Lincoln Medical Center d/b/a Scottsdale Lincoln Health Network, John C. Lincoln Hospital - North Mountain, John C. Lincoln North Mountain Hospital, Scottsdale Healthcare Hospitals, John C. Lincoln Health Network, SHC John C. Lincoln North Mountain ("Lincoln Medical Center"), Provider No. 03-0014 for fiscal year ending December 31, 2021;

c)  HonorHealth Scottsdale Osborn Medical Center d/b/a Scottsdale Healthcare Hospitals, Scottsdale Lincoln Health Network, SHC Osborn Medical Center, Osborn Medical Center ("Osborn Medical Center"), Provider No. 03-0038 for fiscal year ending December 31, 2021;

d)  HonorHealth Scottsdale Shea Medical Center d/b/a Scottsdale Healthcare Hospitals, Scottsdale Lincoln Health Network, SHC Shea Medical Center ("Shea Medical Center"), Provider No. 03-0087 for fiscal year ending December 31, 2021;

e)  Mayo Clinic Arizona d/b/a Mayo Clinic Hospital ("Mayo Clinic Arizona"), Provider No. 03-0103 for fiscal year ending December 31, 2021;

f)  Mayo Clinic Florida d/b/a Mayo Clinic Jacksonville ("Mayo Clinic Florida"), Provider No. 10-0151 for fiscal year ending December 31, 2021;

g)  Mayo Clinic Health System – Southwest Minnesota Region d/b/a Mayo Clinic Health System Mankato ("Mayo Clinic Mankato"), Provider No. 24-0093 for fiscal year ending December 31, 2021;

h)  Mayo Clinic Health System – Southwest Wisconsin Region d/b/a Mayo Clinic Health System Franciscan Healthcare Inc. La Crosse ("Mayo Clinic La Crosse"), Provider No. 52-0004 for fiscal year ending December 31, 2021;

i)  Mayo Clinic Health System Eau Claire Hospital d/b/a Mayo Clinic Health System in Eau Claire ("Mayo Clinic Eau Claire"), Provider No. 52-0070 for fiscal year ending December 31, 2020;

j)  Mayo Clinic Hospital Rochester d/b/a Mayo Clinic Health System Rochester ("Mayo Clinic Rochester"), Provider No. 24-0010 for fiscal year ending December 31, 2021;

k)  Milton S. Hershey Medical Center d/b/a Penn State Health Milton S. Hershey Medical Center ("Hershey Medical Center"), Provider No. 39-0256 for fiscal years ending June 30, 2021, and June 30, 2022; and,

l)  St. Joseph Regional Health Network d/b/a St. Joseph Medical Center ("St. Joseph Medical Center"), Provider No. 39-0096 for fiscal years ending June 30, 2021, and June 30, 2022;

13.     Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health

and Human Services and is the federal officer responsible for administering the Medicare program pursuant to the Social Security Act.  Defendant is sued in his official capacity.  References to "Defendant" or "Secretary" herein are meant to refer to him, his subordinates, his official predecessors or successors, and the Department and its components that he oversees, as the context requires.

## LEGAL BACKGROUND

### I.    The Medicare Program Generally

14.    Medicare is a public health insurance program that furnishes health benefits to the aged and disabled.  42 U.S.C. § 1395c.  The Secretary has delegated much of the responsibility for administering the Medicare program to the Centers for Medicare and Medicaid Services ("CMS"), which is a component of the Department of Health and Human Services.

15.    The Medicare statute requires the Secretary to prospectively pay hospitals for inpatient operating and capital related costs, as set forth respectively at 42 U.S.C. § 1395ww(d) and 42 U.S.C. § 1395ww(g).

### II.    Medicare Prospective Payments for Operating Costs – Subsection (d)

16.    When Medicare was first enacted, hospitals were reimbursed on a cost basis.  42 U.S.C. § 1395x(v)(1)(A).  Over time, however, it was recognized that costs could be better contained if hospitals were paid for their costs prospectively, rather than the hospital's retrospective calculation of their reasonable costs for the year.  Thus, Congress, through a series of legislative changes, phased in a prospective payment system for hospital inpatient costs. Congress first required the Medicare program to implement a prospective payment system for operating costs in 1983.  Social Security Amendments of 1983, Pub. L. No. 98-21, § 601; 42 U.S.C. § 1395ww(d)(1).

7

17.    The Medicare statute provides for the prospective payment of hospital *operating* costs in subsection (d) of 42 U.S.C. § 1395ww.  Payment is based on a predetermined rate for patient discharges set according to expected costs associated with patients' diagnoses.  42 U.S.C. § 1395ww(b)(2).

18.    Each type of diagnosis falls within a diagnosis related group that is associated with a specific weighting.  42 U.S.C. § 1395ww(d)(4).  The weighting is multiplied by a "standardized amount" to result in the payment for that particular admission.  42 U.S.C. § 1395ww(d)(3)(A). The standardized amount is in turn comprised of two components: (a) a labor-related portion; and (b) a non-labor-related portion.  42 U.S.C. § 1395ww(d)(3)(E).  The labor-related portion is multiplied by a labor factor, called the "wage index," which varies based on the geographic area where the hospital is situated.  *Id.*

19.    For purposes of the wage index, each hospital is assigned to a given urban or rural area.  The Secretary has assigned a wage index value to each wage area that reflects the hospital wage levels of that area relative to all geographic areas.  42 C.F.R. § 412.64(h).  The Secretary has defined an "urban area" as a "Metropolitan Statistical Area [("MSA")] or a metropolitan division (in the case where a Metropolitan Statistical Area is divided into Metropolitan Divisions), as defined by the Executive Office of Management and Budget" and a "rural area" as "an area outside an urban area."  42 C.F.R. §§ 412.64(b)(1)(ii)(A), (C).  Each state has multiple "urban areas," and most have one "rural area."  42 U.S.C. § 1395ww(d)(2)(D) (defining "urban" and "rural" for purposes of the inpatient payment); 42 C.F.R. § 412.64(b).

20.    Besides the costs associated with labor and the severity of a patient's diagnosis, Congress also recognized several other factors that could increase a hospital's operating costs. Congress therefore implemented payment adjustments to account for these costs, including DSH

adjustments to aid safety net hospitals, Social Security Amendments of 1983, Pub. L. No. 98-21, § 601; 42 U.S.C. § 1395ww(d)(5)(D), as well as an indirect medical education adjustment for teaching hospitals, Social Security Amendments of 1983, Pub. L. No. 98-21, § 601; 42 U.S.C. § 1395ww(d)(5)(B)).  Initially, capital costs remained paid on a reasonable cost basis.  56 Fed. Reg. 43358, 43358 (Aug. 30, 1991) (noting that prior to 1991, "hospital inpatient operating costs were the only costs covered under the prospective payment system").

### III.    Reclassifications

21.    Following the implementation of the inpatient prospective payment system, Congress determined that some hospitals needed a mechanism by which to petition the Secretary for modifications to the portion of their reimbursement associated with their physical location. Some hospitals' cost structures resembled the cost structures of hospitals in neighboring areas more than the cost structures of hospitals within their own area, meaning that payment equity required an exceptions process.

22.    Congress therefore allowed, as of 1991, hospitals to "reclassify" to a neighboring geographic area, such that they can obtain that area's wage index, which would have expenses more commensurate with the reclassifying hospital's expenses.  Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6003(h)(1); 42 U.S.C. § 1395ww(d)(10).

23.    Initially, the Secretary allowed two different forms of reclassifications.   The standardized amount at the time differed depending upon whether a hospital was in a rural area or an urban area.  42 U.S.C. § 1395ww(d)(3)(A)(ii).

24.    Accordingly, the Secretary created one pathway to allow rural hospitals to reclassify as urban for purposes of obtaining the urban standardized amount. 55 Fed. Reg. 36754, 36755 (Sept. 6, 1990).  This required a showing of the hospital's high total costs per discharge.  42

C.F.R. § 412.230(d)(1) (1991).

25.     The second type of reclassification allowed a hospital to obtain the wage index of a neighboring area.  55 Fed. Reg. at 36755.  Qualification for this reclassification required only a showing of high wage costs for the applicant hospital.  42 C.F.R. § 412.230(e)(i) (1991).

26.     The urban and rural standardized rates were equalized under the Medicare Prescription Drug, Improvement and Modernization Act of 2003; Pub. L. No. 108-173, § 401. Accordingly, the Secretary removed the standardized amount reclassification provisions.  69 Fed. Reg. 48915, 49103 (Aug. 11, 2004); *compare* 42 C.F.R. §§ 412.230(a)(1)(i) *with* (a)(1)(ii) (pre- and post-2005 reclassification purposes).  Only wage index reclassifications remain.

## IV.     Medicare Prospective Payments for Operating Costs – Subsection (g)

27.     Once the operating expense prospective payment was completed, Congress then required that the Medicare program develop a prospective payment system for capital-related costs of inpatient hospital services, effective as of October 1, 1991. Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203 § 4006(b)(1); 42 U.S.C. § 1395ww(g).

28.     The Secretary was required specifically to pay on a "per discharge basis" based on a "weighting" appropriate for "the classification of [each such] discharge."   42 U.S.C. § 1395ww(g)(1)(B)(i); *see also* H.R. Rep. No. 100-495 at 534 (1987) (describing Congress's directive to establish a capital-related cost prospective payment system).

29.     In other words, capital costs would now be determined prospectively based on the anticipated cost per discharge, rather than retrospectively at the end of a cost reporting year.

30.     While they may appear similar, the operating cost prospective payment system and the capital cost prospective payment system are separate.  These prospective payment systems are covered by separate statutory provisions—42 U.S.C. § 1395ww(d) and § 1395ww(g), respectively.

Importantly, 42 U.S.C. § 1395ww(g) (related to capital costs) does not cross-reference 42 U.S.C. § 1395ww(d) (related to operating costs).

31. The capital prospective payment system provision includes two permissive adjustments and one exception process, each of which reflects cases where cost anomalies may need to be addressed by the Secretary.

32. The first adjustment permits the Secretary to take into account variations in the relative costs of capital and construction for the different types of facilities or areas in which they are located (variations in local cost). 42 U.S.C. § 1395ww(g)(1)(B)(ii).

33. The second adjustment permits the Secretary to take into account variations in hospital occupancy rate. 42 U.S.C. § 1395ww(g)(1)(B)(iv).

34. The exception process permits the Secretary to grant exceptions, including appropriate exceptions to reflect existing capital obligations. 42 U.S.C. § 1395ww(g)(1)(B)(iii).

35. The Secretary implemented this statute in regulation. The key features of the regulatory scheme were all supported by cost analyses.

36. The Secretary initially concluded that there was "wide variation in capital costs per case" experienced by various hospitals. 56 Fed. Reg. at 43363.

37. Consequently, the Secretary conducted a comprehensive regression analysis to evaluate the relationship between historic capital costs and certain types of hospital groups. *Id*. at 43369–82.

38. The Secretary's cost analysis focused on several specific circumstances including:

- Teaching hospitals;

- Hospitals with a higher number of low-income patients;

- Hospitals in an urban setting;

11

- Hospitals in a large urban setting; and

- Hospitals in a rural setting.

*Id.*

39.    Having concluded that some of these characteristics were predictive of capital costs, the Secretary created certain capital cost payment adjustments that mirrored certain parallel operating cost adjustments.  *Id.* at 43369–70 (noting that the Secretary has "latitude to develop adjustments based on combined costs for the capital prospective payment system.").  Specifically, the Secretary created an indirect teaching adjustment for teaching hospitals and a DSH adjustment for safety net hospitals.  *Id.* at 43452–53.

40.    The regulation and initial rulemaking also address all of the instances of the Secretary's discretionary authority to make modifications to its general rule.

41.    The Secretary properly understood that each such exception needed to be interpreted in terms of reflecting a modification that would be narrowly tailored to specific cost anomalies.  As a result, the Secretary opted to create:

- Adjustments for local cost variations through the geographic adjustment factor.  42 C.F.R. § 412.316 (reflecting the permissive authority of 42 U.S.C. § 1395ww(g)(1)(B)(ii) to take into account the relative costs of capital and construction in various geographic marketplaces); 56 Fed. Reg. at 43374; and

- Exception payments for hospitals meeting certain specified criteria.  42 C.F.R. § 412.348 (reflecting the permissive authority of 42 U.S.C. § 1395ww(g)(1)(B)(iii) to grant exceptions in cases determined appropriate by the Secretary).

42.    Although the Secretary recognized his discretionary ability to create an adjustment for hospital occupancy levels, he determined that such an adjustment did not bear a sufficient

relationship to costs and therefore declined to create such an adjustment. *Id.* at 43411–12.

43.    These regulations demonstrate that the Secretary has already considered, and engaged in explicit rulemaking about, the additional criteria for which he has discretion under § 1395ww(g).  There are no other authorities that provide for any adjustments in the Secretary's sole discretion except those arising from cost considerations.

## V.    The Capital DSH Adjustment

44.    As previously stated, one of the hospital categories whose cost data merited special treatment are safety net hospitals.  For these hospitals, the Secretary created the capital DSH payment adjustment.  42 C.F.R. § 412.320(b)(1); *see also* 56 Fed. Reg. at 43377–79.

45.    The Secretary performed a regression analysis to determine the proper amount to pay these hospitals to compensate them for their capital costs through the DSH payment mechanism.  56 Fed. Reg. at 43369–82.

46.    Notably, this regression analysis indicated that safety net hospitals in rural areas did not incur higher capital costs, and therefore the Secretary determined not to make higher payments to them.  *Id*. at 43377.  Thus, only urban DSH hospitals could receive the adjustment. Unlike now, all rural hospitals were hospitals physically located in the rural area at the time this regulation was promulgated.

47.    The initial capital cost prospective payment rulemaking also addressed how to treat hospitals that have undergone a geographic reclassification for operating cost prospective payment system purposes.  The Secretary distinguished between the two types of reclassifications noted above (i.e., "standardized amount" reclassifications and "wage index" reclassifications) and their impact on capital DSH as follows:

Any hospital that is reclassified to an urban area by the [Medicare Geographic

Classification Review Board ("MGCRB")] for purposes of its standardized amount is considered to be urban for all prospective payment purposes other than the wage index. As such, if any hospital reclassified by the MGCRB to an urban area for purposes of the standardized amount has at least 100 beds, it would be eligible for capital disproportionate share payments. We note that a rural hospital reclassified for purposes of the wage index only is still considered a rural hospital, and as such, will not be eligible for capital disproportionate share payments.

*Id.* at 43379.

48.     As previously discussed, the "standardized amount" reclassifications required a more comprehensive demonstration of higher total costs, as compared with the more limited wage data necessary to qualify for a "wage index" reclassification.

49.     Therefore, the Secretary allowed only the standardized amount reclassification to result in a higher capital DSH payment. The latter, with only high wage costs presented, would not generally have been able to show that their costs were comparable to urban hospitals, and therefore capital DSH payment would not be warranted. Thus, as with every other consideration of geographic adjustments to the capital cost prospective payment system, the cost element generated the policy decision. Such consideration tracks the governing statute, 42 U.S.C. § 1395ww(g)(1)(B)(ii), which allows the Secretary to make "adjustment[s] to take into account variations in the relative costs of capital . . . for the different types of facilities."

## VI.    Rural Reclassification

50.     Separately, in 1999, Congress created a pathway for hospitals to assume "rural" status for purposes of the operating prospective payment system. Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, § 401 (1999); 42 U.S.C. § 1395ww(d)(8)(E).

51.     To qualify for rural status, all a hospital need show is that it could otherwise have qualified as a rural referral center ("RRC") or a sole community hospital ("SCH") but for its

location in an urban area.  42 U.S.C. § 1395ww(d)(8)(E)(ii)(III).

52.    The manifest intent of the statute was to allow hospitals that were close to meeting the requirements of RRC or SCH status, but for their location in an urban area, to be able to overcome that last requirement by making the election to become rural.  Indeed, in the Secretary's Federal Register preamble implementing this statute, it specifically laid out the two-step approach towards obtaining RRC or SCH status for an urban hospital following this pathway.  65 Fed. Reg. 47026, 47030–31 (Aug. 1, 2000).

53.    Generally speaking, it is not desirable to be a "rural" hospital because some portion of the prospective payment is based on the hospital's wage index, which is based on the costs of labor in the hospital's geographic area.  42 C.F.R. § 412.64(h) (operating payment); 42 C.F.R. § 412.316 (capital payment).  Geographically rural hospitals generally have lower costs of labor, meaning that their wage indexes are lower than urban areas.

54.    However, SCHs are entitled to favorable reimbursement status.    42 C.F.R. § 412.92(d).  Previously, RRCs had favorable reimbursement status as well.  42 C.F.R. § 412.96(e) (for discharges prior to FY 1995, RRCs were paid at an urban, instead of rural, rate for their standardized amount).  RRCs and SCHs also continue to have favorable status for reclassification purposes, which allows them to waive certain proximity and wage index requirements.  42 C.F.R. §§ 412.230(a)(3) & (d)(3).

55.    Becoming an "acquired" rural status hospital under this pathway has no connection to either: (a) the hospital's actual geographic location; or (b) the hospital's cost structure.

56.    There are, for instance, hospitals in New York City that have "acquired" rural status.  *See* 84 Fed. Reg. 42044, 42679 (Aug. 16, 2019) (referencing the FY 2020 Proposed Rule Impact File, available on the CMS.gov website at the "FY2020 IPPS Final Rule Home Page").

From a cost structure, it is clear that their costs are like (if not significantly in excess of) any other urban hospital's cost.

57.     A typical physically located rural hospital in New York State would be located outside an MSA and in a rural area of the state, serving a county with a relatively small population and having a bed count under 100.  Yet both it and reclassified hospitals in New York City are deemed "rural" for certain operating cost prospective payment purposes.  The term "rural" is therefore simply a categorization of a type of hospital, and not any indication of whether the hospital's cost structure is like a hospital that is truly "rural" as a layperson would understand that term.

**VII.     The Secretary's 2006 Capital DSH Rule**

58.     Although initially the Secretary properly understood that the purpose of the capital prospective payment was to determine prospectively a hospital's expected per-discharge capital costs and pay accordingly, the Secretary subsequently veered away from the statute's dictates.

59.     In 2006, the Secretary promulgated the regulation at issue here, 42 C.F.R. § 412.320(a)(1)(iii), which sets forth that "for an urban hospital that is reclassified as rural as set forth in § 412.103, the geographic classification is rural," which results in barring the hospital from receiving the capital DSH adjustment.

60.     The Secretary claims in the implementing Federal Register notice that his rationale for this policy is as follows:

> These changes were proposed to reflect our historic policy that hospitals reclassified as rural under § 412.103 also are considered rural under the capital PPS [prospective payment system].  Since the genesis of the capital PPS in FY 1992, the same geographic classifications used under the operating PPS also have been used under the capital PPS.

71 Fed. Reg. 47870, 48104 (Aug. 18, 2006).  The Secretary's statements, however, lack any

grounding in actual fact.

61.     The only instances in which the Secretary addressed capital DSH and geographic locations were in 1991 and 2004.   In 1991, the Secretary actually distinguished between reclassifications for standardized amount and those for wage index.   Only the former were accepted for determining an adjustment to capital cost prospective payments.   56 Fed. Reg. at 43379.   To achieve a standardized amount reclassification required a showing of higher total costs, as compared with the other hospitals in the reclassifying hospital's geographic area.   42 C.F.R. § 412.230(d).

62.     Moreover, in 2004, the Secretary stated that he would no longer take into account *any* hospital reclassifications for receipt of certain special capital payments.   At that time, the Secretary stated that a hospital must be physically located in an urban, or large urban, area to obtain the capital cost payment benefits associated with those areas.   69 Fed. Reg. at 49187 (promulgating a revised regulation at 42 C.F.R. § 412.320(a)).

63.     As to whether it had actually been the Secretary's policy to treat hospitals as rural when they have "acquired" rural status under 42 C.F.R. § 412.103, there is no public reference to that policy prior to 2006.   And even if it had been the Secretary's policy, it had not been longstanding, given that "acquired" rural status was not even available to hospitals until 2001.

64.     In any event, the Secretary has *never* produced any cost analysis that showed that the capital cost structure of "acquired" rural status hospitals is similar to other hospitals physically located in the rural area.   Nor could it, since, in fact, these hospitals are urban hospitals and obtaining rural status does not change a hospital's costs.

65.     The Secretary's policy also conflicts with his policy statements articulated just the year before.   As noted above, one of the payment adjustments created by Congress as part of the

17

operating cost payment system relates to payments for the indirect costs of graduate medical education.

66.    Congress also created a separate payment adjustment for direct graduate medical education, which is codified at 42 U.S.C. § 1395ww(h).

67.    Rural status under that statute has certain favorable aspects, specifically relating to the number of full-time equivalent residents ("FTEs") which are reimbursable to the hospital.  42 U.S.C. § 1395ww(h)(4)(F)(i) (the limit on reimbursable FTEs is often referred to as the "FTE cap").

68.    The Secretary addressed the *inapplicability* of "acquired" rural status to direct graduate medical education ("GME") by stating:

> A hospital's reclassification as located in a rural area under this provision affects only payments under section 1886(d) of the Act [found at 42 U.S.C. § 1395ww(d)]. Accordingly, a hospital that is treated as rural under this provision can receive the FTE cap adjustments that any other rural hospital receives, but only to the FTE cap that applies for purposes of [indirect medical education ("IME")] payments, which are made under section 1886(d) of the Act.  The hospital could not receive adjustments to its direct GME FTE cap because payments for direct GME are made under section 1886(h) of the Act and the section 1886(d)(8)(E) reclassifications affect only the payments that are made under that section 1886(d) of the Act. Therefore, a hospital that reclassifies as rural under section 1886(d)(8)(E) of the Act may receive the 130-percent adjustment to its IME FTE cap and its IME FTE cap may be adjusted for any new programs, similar to hospitals that are actually located in a rural location.

70 Fed. Reg. 47278, 47437 (Aug. 12, 2005) (emphasis added).

69.    The Secretary demonstrated a similar understanding of the separateness of the operating and capital payment system in his 2007 rulemaking.  In that rulemaking, the Secretary reiterated his belief that he has "broad authority" to establish and implement the capital cost payment system.  72 Fed. Reg. 47130, 47392 (Aug. 22, 2007).  He also acknowledged that Congress set forth "broad governing principles" for this payment system, and that any

modifications to this payment system must remain "within those principles." *Id*. at 47398. Chief among such principles is that the capital cost payment system must ensure that "standard payment rates . . . reflect the costs that an average, efficient provider would bear to provide the services required for quality patient care." *Id*. at 47394.

70. On that basis, the Secretary determined that the margins between payment and capital cost had increased, and therefore he chose to recalibrate payment to better reflect actual costs, including the removal of certain adjustments altogether. *Id.* at 47395–96.

71. Of particular relevance here, the Secretary rebuffed requests from some hospitals seeking that the Secretary look at total operating and capital costs together when determining hospitals' margins.

72. The Secretary stated that "we believe that it is appropriate under the current design of the capital and operating IPPSs [inpatient prospective payment systems] to base proposals for payment policies under the capital IPPS on analysis that is confined to the data regarding the capital IPPS alone." *Id*. at 47399. In other words, the Secretary again reiterated that operating cost payment policies and cost data should only affect the operating prospective payment system, and the capital prospective payment system should reflect capital cost data standing alone.

## VIII.    Impact of Dual Reclassifications

73. In 2016, the Secretary changed his rules regarding which hospitals could undergo an MGCRB reclassification. 81 Fed. Reg. 23428, 23433–34 (April 21, 2016).

74. Previously, the Secretary had stated that "acquired" rural status hospitals could not undergo an MGCRB reclassification. The Secretary justified this rule on the policy reason that hospitals asserting that urban status puts them at a disadvantage should not be able to then claim that the disadvantages of rural status entitle them to reclassify. 65 Fed. Reg. at 47088.

75.     The Secretary then lost two cases in the Second Circuit and Third Circuit where the courts, in analyzing the phrase "for purposes of this subsection" within 42 U.S.C. § 1395ww(d)(8)(E), held that this phrase has a plain and explicit meaning.  *Geisinger Cmty. Med. Ctr. v. Sec'y, U.S. Dep't of Health and Human Servs.*, 794 F.3d 383 (3d Cir. 2015); *Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257 (2nd Cir. 2016).  Since § 1395ww(d)(10) (pertaining to reclassifications) is in § 1395ww(d), then an "acquired" rural status hospital can use that status for other purposes within § 1395ww(d).  In other words, these Courts did not allow the Secretary to use his policy considerations to supersede the plain meaning of the applicable statute.

76.     The Secretary ultimately relented and acquiesced in those holdings by finally allowing hospitals to undergo dual reclassifications. 81 Fed. Reg. at 23433–34.

## IX.     Medicare Cost Report Appeals

77.     At the close of a hospital's fiscal year, it is required to submit to its designated Medicare Administrative Contractor ("MAC") a "cost report" showing both the costs incurred by the hospital during the fiscal year and the appropriate share of these costs to be apportioned to Medicare.  42 C.F.R. § 413.24(f) (2018).  MACs are private companies under contract with the Secretary to pay Medicare claims and audit hospital cost reports, among other duties.  42 U.S.C. § 1395kk-1.

78.     The MAC must analyze and audit the cost report and inform the hospital of a final determination of the amount of Medicare reimbursement through a Notice of Program Reimbursement ("NPR").  42 C.F.R. § 405.1803(a).  The capital DSH adjustment is among the components of the final payment determination reported in the NPR.

79.    A hospital that is dissatisfied with the MAC's final determination or that did not receive a timely MAC final determination has a statutory right to a hearing before the Board.  42 U.S.C. § 1395oo(a).

80.    The Board has jurisdiction over such appeals if the following three requirements are met: (1) the hospital is dissatisfied with the final MAC determination or has not received a final determination from the MAC on a timely basis; (2) the amount in controversy is at least $10,000; and (3) the hospital requests a hearing within 180 days of receiving the final determination or within 180 days after such determination would have been received if it had been timely made.  *Id*.

81.    A group of hospitals may appeal a common dispute to the Board if the following requirements are met: (1) the hospitals are dissatisfied with the final MAC determinations or have not received final determinations from the MAC on a timely basis; (2) the amount in controversy is, in the aggregate, at least $50,000; and (3) the hospitals request a hearing within 180 days of the Secretary's determinations or within 180 days after such determinations would have been received if they had been timely made.  42 U.S.C. § 1395oo(a)–(b).

82.    In addition, for group appeals, the matter at issue must involve "a single question of fact or interpretation of law, regulations, or CMS Ruling that is common to each provider in the group."  42 C.F.R. § 405.1837(a)(2).  The Board lacks the authority to decide the validity of a Medicare regulation.  42 C.F.R. § 405.1867.  If a hospital (or group of hospitals) appeals an issue that involves a question that is beyond the Board's authority, the Board may authorize EJR of the case.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

83.    The Board must grant EJR if it determines that (1) the Board does not have the authority to decide the legal question because the question is a challenge either to the

constitutionality of a statute or to the substantive or procedural validity of a regulation or CMS Ruling; and (2) the Board has jurisdiction to hold a hearing on the specific matter at issue. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842(f)(1).

84.    If the Board issues an EJR decision, the CMS Administrator has the right to "review the Board's jurisdictional finding, but not the Board's authority determination." 42 C.F.R. § 405.1842(a)(3). The Board's decision to grant EJR "becomes final and binding on the parties unless the decision is reversed, affirmed, modified, or remanded by the Administrator." 42 C.F.R. § 405.1842(g)(1)(iii). A final Board decision constitutes the final agency action of the Secretary. 42 C.F.R. § 405.1877(a)(2).

85.    If the Board grants a hospital's request for EJR, the hospital may seek judicial review of the action involving a question of law or regulations by commencing a civil action within sixty days of the date on which notification of the Board's EJR determination is received. 42 U.S.C. § 1395oo(f)(l); 42 C.F.R. § 405.1842(g)(2).

86.    Under the Administrative Procedure Act ("APA"), a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

## X.    The Secretary's "Substantive Claim" Requirement

87.    The regulation at 42 C.F.R. § 413.24(j)(1) requires that a provider include a claim on its cost report by either "[c]laiming full reimbursement in the provider's cost report for the specific item in accordance with Medicare policy, if the provider seeks payment for the item that it believes comports with program policy" or "[s]elf-disallowing the specific item in the provider's

cost report, if the provider seeks payment that it believes may not be allowable or may not comport with Medicare policy."  These provisions apply to cost reporting periods beginning on or after January 1, 2016.  The regulation at 42 C.F.R. § 405.1873 goes on to establish procedures the Board must follow to determine a provider's compliance with § 413.24(j).  Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs, 80 Fed. Reg. 70298, 70551–65, 70603–04 (Nov. 13, 2015).

88.     Pursuant to rules established by the Board, when the "final schedule of providers for a group appeal is filed concurrently with an EJR request," the MAC has "five (5) business days to either" file a substantive claim challenge or "[s]ubmit a filing . . . certif[ying] that it will, *in fact*, be filing a challenge(s) . . . .[emphasis in original]."  Board Rule 20 also instructs that if all required jurisdictional documents have been filed in the Board's electronic filing system, a provider should file a letter, known as a Rule 20 letter, so certifying to the Board instead of filing a final schedule of providers.  If the MAC files the certification, it must "file the challenge(s) no later than 20 days following     the     filing     of     the     EJR     request."     PRRB     Rule     44.6 (https://www.cms.gov/files/document/current-prrb-rules-v-32-board-order-no-4-december-15-2023.pdf).  Thus, if a provider files a Rule 20 letter or a final schedule of provider concurrently with a EJR request, the MAC has five business days to file a substantive claim challenge or "[s]ubmit a filing…certif[ying] that it will, *in fact*, be filing a [substantive claim] challenge" and then the MAC has 20 days to file the substantive claim challenge  *Id.*

89.     The statute governing the Board empowers it to decide a provider's dissatisfaction with "the   amount   of   total   program   reimbursement   due   the   provider."   42 U.S.C. § 1395oo(a)(1)(A)(i).  Nowhere in that statute is there a requirement that a provider must include a claim for a specific cost on its cost report before payment related to that cost can be addressed

by the Board.

## FACTS SPECIFIC TO THIS CASE

90.    All of the Plaintiffs in this case are hospitals that participated in the Medicare program during the appealed period.

91.    As set forth with more particularity below, each Plaintiff hospital was a safety net hospital physically located in an MSA, and thus in an urban area, during the appealed period. Prior to that period, each hospital underwent a rural reclassification and was therefore considered to be rural as of that date and did not receive any capital DSH payment for the period under appeal.

### I.    Deer Valley Medical Center

92.    Deer Valley Medical Center was a safety net hospital physically located in Phoenix, Arizona during the year under appeal.

93.    Phoenix was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

94.    Thus, Deer Valley Medical Center was physically located in an urban area during the year under appeal.

95.    Deer Valley Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS. Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

96.    Deer Valley Medical Center did not receive capital DSH payment for the period under appeal.

### II.    Lincoln Medical Center

97.    Lincoln Medical Center was a safety net hospital physically located in Phoenix,

Arizona during the year under appeal.

98.    Phoenix was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

99.    Thus, Lincoln Medical Center was physically located in an urban area during the year under appeal.

100.    Lincoln Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS.  Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

101.    Lincoln Medical Center did not receive capital DSH payment for the period under appeal.

**III.    Osborn Medical Center**

102.    Osborn Medical Center was a safety net hospital physically located in Scottsdale, Arizona during the year under appeal.

103.    Scottsdale was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

104.    Thus, Osborn Medical Center was physically located in an urban area during the year under appeal.

105.    Osborn Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS.  Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

106.    Osborn Medical Center did not receive capital DSH payment for the period under

25

appeal.

**IV.    Shea Medical Center**

107.    Shea Medical Center was a safety net hospital physically located in Scottsdale, Arizona during the year under appeal.

108.    Scottsdale was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

109.    Thus, Shea Medical Center was physically located in an urban area during the year under appeal.

110.    Shea Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS.  Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

111.    Shea Medical Center did not receive capital DSH payment for the period under appeal.

**V.    Mayo Clinic Arizona**

112.    Mayo Clinic Arizona was a safety net hospital physically located in Phoenix, Arizona during the year under appeal.

113.    Phoenix was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

114.    Thus, Mayo Clinic Arizona was physically located in an urban area during the year under appeal.

115.    Mayo Clinic Arizona underwent a rural reclassification with an effective date of December 27, 2016, by application to CMS.  Therefore, although it remained physically in the

Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

116.    Mayo Clinic Arizona did not receive a capital DSH payment for the period under appeal.

**VI.    Mayo Clinic Florida**

117.    Mayo Clinic Florida was a safety net hospital physically located in Jacksonville, Florida during the year under appeal.

118.    Jacksonville was located within the Jacksonville, FL MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

119.    Thus, Mayo Clinic Florida was physically located in an urban area during the year under appeal.

120.    Mayo Clinic Florida underwent a rural reclassification with an effective date of December 23, 2019, by application to CMS.  Therefore, although it remained physically in the Jacksonville, FL MSA, it was considered to be in the rural area of Florida as of that date.

121.    Mayo Clinic Florida did not receive a capital DSH payment for the period under appeal.

**VII.    Mayo Clinic Mankato**

122.    Mayo Clinic Mankato was a safety net hospital physically located in Mankato, Minnesota during the year under appeal.

123.    Mankato was located within the Mankato, MN MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

124.    Thus, Mayo Clinic Mankato was physically located in an urban area during the year under appeal.

27

125.     Mayo Clinic Mankato underwent a rural reclassification with an effective date of October 1, 2020, by application to CMS.  Therefore, although it remained physically in the Mankato, MN MSA, it was considered to be in the rural area of Minnesota as of that date.

126.     Mayo Clinic Mankato did not receive a capital DSH payment for the period under appeal.

### VIII.     Mayo Clinic La Crosse

127.     Mayo Clinic La Crosse was a safety net hospital physically located in La Crosse, Wisconsin during the year under appeal.

128.     La Crosse was located within the La Crosse-Onalaska, WI-MN MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

129.     Thus, Mayo Clinic La Crosse was physically located in an urban area during the year under appeal.

130.     Mayo Clinic La Crosse underwent a rural reclassification with an effective date of October 3, 2016, by application to CMS.  Therefore, although it remained physically in the La Crosse-Onalaska, WI-MN MSA, it was considered to be in the rural area of Wisconsin as of that date.

131.     Mayo Clinic La Crosse did not receive a capital DSH payment for the period under appeal.

### IX.     Mayo Clinic Eau Claire

132.     Mayo Clinic Eau Claire was a safety net hospital physically located in Eau Claire, Wisconsin during the year under appeal.

133.     Eau Claire was located within the Eau Claire, WI MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

28

134.    Thus, Mayo Clinic Eau Claire was physically located in an urban area during the year under appeal.

135.    Mayo Clinic Eau Claire underwent a rural reclassification with an effective date of December 31, 2015, by application to CMS.  Therefore, although it remained physically in the Eau Claire, WI MSA, it was considered to be in the rural area of Wisconsin as of that date.

136.    Mayo Clinic Eau Claire did not receive a capital DSH payment for the period under appeal.

### X.    Mayo Clinic Rochester

137.    Mayo Clinic Rochester was a safety net hospital physically located in Rochester, Minnesota during the year under appeal.

138.    Rochester was located within the Rochester, MN MSA and thus in an "urban area" for Medicare payment purposes during the year under appeal.

139.    Thus, Mayo Clinic Rochester was physically located in an urban area during the year under appeal.

140.    Mayo Clinic Rochester underwent a rural reclassification with an effective date of April 15, 2021, by application to CMS.  Therefore, although it remained physically in the Rochester, MN MSA, it was considered to be in the rural area of Minnesota as of that date.

141.    Mayo Clinic Rochester did not receive a capital DSH payment for the period under appeal.

### XI.    Hershey Medical Center

142.    Hershey Medical Center was a safety net hospital physically located in Hershey, Pennsylvania during the years under appeal.

143.    Hershey was located within the Harrisburg-Carlisle, PA MSA and thus in an

"urban area" for Medicare payment purposes during the years under appeal.

144.    Thus, Hershey Medical Center was physically located in an urban area during the years under appeal.

145.    Hershey Medical Center underwent a rural reclassification with an effective date of April 4, 2017, by application to CMS.  Therefore, although it remained physically in the Harrisburg-Carlisle, PA MSA, it was considered to be in the rural area of Pennsylvania as of that date.

146.    Hershey Medical Center did not receive capital DSH payment for the period under appeal.

**XII.    St. Joseph Medical Center**

147.    St. Joseph Medical Center was a safety net hospital physically located in Reading, Pennsylvania during the years under appeal.

148.    Reading was located within the Reading, PA MSA and thus in an "urban area" for Medicare payment purposes during the years under appeal.

149.    Thus, St. Joseph Medical Center was physically located in an urban area during the years under appeal.

150.    St. Joseph Medical Center underwent a rural reclassification with an effective date of June 29, 2017, by application to CMS.  Therefore, although it remained physically in the Reading, PA MSA, it was considered to be in the rural area of Pennsylvania as of that date.

151.    St. Joseph Medical Center did not receive capital DSH payment for the period under appeal.

**XI.    Proceedings Below**

152.    Each Plaintiff timely filed an appeal with the Secretary's Board following the

receipt of its final determination from its MAC or the MAC's failure to timely issue a final determination pursuant to 42 U.S.C. § 1395oo(a). The Board assigned those case numbers 24-2564GC, 25-0191GC, 25-0362GC, and 25-0865GC. These cases are all group appeals formed pursuant to the applicable regulations and rules.

153.    On November 5, 2025, the Plaintiffs in all of these cases submitted a consolidated request that the Board grant EJR on the question of the validity of the Secretary's regulation at 42 C.F.R. § 412.320(a)(1)(iii), which bars hospitals that are geographically urban and reclassify as rural under 42 C.F.R. § 412.103 from receiving the capital DSH adjustment. Exhibits A, B.

154.    On November 12, 2025, within five business days of November 5, 2025, the MAC filed an EJR Response asserting that substantive claim challenges would be filed only in Case Nos. 24-2564GC and 25-0191GC, which the MAC timely filed. Exhibit B.

155.    The MAC filed substantive claim challenges in the following case numbers related to the identified hospitals: (a) Case No. 24-2564GC: St. Joseph Medical Center; and (b) Case No. 25-0191GC: Mayo Clinic Arizona, Mayo Clinic Florida, Mayo Clinic Mankato, Mayo Clinic La Crosse, Mayo Clinic Eau Claire, and Mayo Clinic Rochester. Exhibit B.

156.    On November 25, 2025, the Board granted EJR in Case Nos. 25-0865GC and 25-0362GC. Exhibit A. The Board concluded in this EJR determination that it had jurisdiction over the matter for the subject years and lacked the authority to decide the legal question of whether 42 C.F.R. § 412.320(a)(1)(iii) is valid. The Board made no findings of substantive claim violations in these cases. Exhibit A.

157.    On December 11, 2025, the Plaintiffs in Case Nos. 24-2564GC and 25-0191GC responded to the MAC's substantive claim allegations and submitted a request that the Board also grant EJR on the question of the validity of the Secretary's substantive claim regulations at 42

C.F.R. §§ 413.24(j) and 405.1873.  Exhibit B.

158.    On January 6, 2026, the Board issued its EJR ruling related to Case Nos. 24-2564GC and 25-0191GC and granted EJR for all of the Plaintiffs in both cases on the issue of the validity of 42 C.F.R. § 412.320(a)(1)(iii).  Exhibit B.

159.    With regard to the substantive claim challenges, the hospitals asserted that one of the hospitals which the MAC asserted did not comply with the substantive claim requirements, Mayo Clinic Eau Claire, Provider No. 52-0070 in Case No. 25-0191GC, did in fact comply with the requirements as it claimed the capital DSH cost at issue as a protested cost on its applicable FY 2021 cost report.  Mayo Clinic Eau Claire asserted that it complied with the substantive claim requirements at 42 C.F.R. § 413.24(j), as it affirmatively claimed the capital DSH cost at issue as an allowable cost, consistent with the court's decision in *Toledo Hosp. v. Becerra*, 621 F. Supp. 3d 13, 17 (D.D.C. 2021) and CMS's subsequent adoption of revisions to the capital DSH regulation in its Fiscal Year 2024 Hospital Inpatient PPS Final Rule.  Medicare Program: Hospital IPPS Fiscal Year 2024 Payment Rates & Policy Changes, 88 Fed. Reg. 58,640, 59,117, 59,334 (Aug. 28, 2023).  The Board found that the hospital's claim for capital DSH payment did not comply with the regulations requiring it to make an appropriate cost report claim at 42 C.F.R. § 413.24(j)(2), and therefore did not comply with the substantive claim requirements.  The Board granted EJR on the validity of the substantive claim regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 for all of the hospitals for which the MAC asserted substantive claim violations. Exhibit B.

160.    As of the filing of this Complaint, the Board's decisions have not been reversed, affirmed, modified, or remanded by the Administrator.  The Board's EJR decisions constitute the Secretary's final agency actions in these cases.  By filing this Complaint, the Plaintiffs have timely sought appeal of the Secretary's final decision under 42 U.S.C. § 1395oo(f)(1).

## COUNT I

### Violations of the Medicare Statute — Capital DSH Payments

161.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

162.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law… [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).

163.    Accordingly, as set forth below, the capital DSH regulation at 42 C.F.R. § 412.320(a)(1)(iii) must be held unlawful and set aside.

164.    The Medicare statutory provision permitting hospitals to obtain "acquired" rural status at 42 U.S.C. § 1395ww(d)(8)(E) does not, standing alone, give CMS the authority to treat hospitals with "acquired" rural status as rural for capital DSH purposes.  Section 1395ww(d)(8)(E) expressly applies only to subsection (d), which addresses operating, not capital, costs.

165.    The Secretary has previously acknowledged this fact in the context of direct graduate medical education payments, as described above.  *See* 70 Fed. Reg. at 47437; 72 Fed. Reg. at 47392, 47395–96, 47399.

166.    The Secretary must adhere to the plain meaning of Subsection (d), as he has been instructed by the courts and acquiesced to in regulation.  *See Geisinger*, 794 F.3d at 395; *Lawrence + Mem'l Hosp.*, 812 F.3d at 266; 81 Fed. Reg. at 23433–34.

167.    Similarly, the Secretary must also adhere to the plain meaning of Subsection (g),

which requires that its capital cost prospective payment system be tied to a hospital's capital costs. And specific to any payment adjustments, such as capital DSH, the Secretary must "take into account variations in the relative costs of capital." 42 U.S.C. § 1395ww(g)(1)(B)(ii).

168.    The Secretary himself acknowledges that, though his authority is broad, he still must adhere to the "broad governing principles," which first and foremost require that the payment system relate to cost. 72 Fed. Reg. at 47398. The statute allows the Secretary discretion in three specific instances: 1) to adjust for relative costs of capital and construction for different types of facilities or areas in which they are located; 2) for exceptions generally related to capital obligations; and 3) adjustments to reflect hospital occupancy rate. None of these discretionary exceptions, as drafted or as implemented, relate to "acquired" rural status. Rather, they all relate to potentially unique cost circumstances, and the Secretary has implemented several of these exceptions accordingly when it has found a cost-based reason to do so.

169.    The Secretary originally interpreted the statute by conducting an analysis of the capital costs various providers actually incurred and used this as a basis to formulate the system. He developed the concept of capital DSH because his analysis showed that it was a faithful proxy for reflecting the capital costs of safety net hospitals treating low-income patients. 56 Fed. Reg. at 43378–79. This original interpretation of the statute was consistent with the statute's plain meaning.

170.    However, the application of the bar to the capital DSH adjustment at 42 C.F.R. § 412.320(a)(1)(iii) bears no relationship to a hospital's costs and therefore is inconsistent with the Secretary's grant of authority in the Medicare statute and must be struck down as unlawful.

## COUNT II

### Arbitrary and Capricious Agency Action — Capital DSH Payments

171.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

172.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious [or] an abuse of discretion."  5 U.S.C. § 706(2).  "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

173.    The regulation at 42 C.F.R. § 412.320(a)(1)(iii) is arbitrary and capricious and an abuse of discretion and is, therefore, invalid.  5 U.S.C. § 706(2).

174.    First, the capital DSH regulation is arbitrary and capricious and an abuse of discretion, because it is contrary to the applicable Medicare statutory provisions, as established immediately above in Count I.

175.    Second, the capital DSH regulation is arbitrary and capricious and an abuse of discretion, because its underlying rulemaking is fatally flawed.  The APA requires that an agency's rulemaking be "reasonable and reasonably explained."  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 406 U.S. 29, 51–2 (1983); *Nat'l Tel. Co-op Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009).  In the 2006 rulemaking adopting 42 C.F.R. § 412.320(a)(1)(iii), the Secretary (a) inaccurately asserted that the adoption of the capital DSH rule merely restored the previously implemented policy and (b) failed to take into account relative costs of capital for various hospital types and areas of location, as required by the controlling capital cost statute at Subsection (g).

176.    In 2006, the Secretary offered two principal justifications for newly promulgating a regulation denying capital DSH to hospitals with acquired rural status.  First, the Secretary claimed that it was "historic policy" to consider these hospitals as rural under the capital prospective payment system.  And second, more broadly, the Secretary stated that, since the inception of its capital prospective payment system, it has always used the same geographic classifications for its capital and operating payment systems.  However, upon close review by the United States District Court for the District of Columbia, neither statement has proven accurate.

177.    In *Toledo Hosp. v. Becerra*, 621 F. Supp. 3d 13, 17 (D.D.C. 2021), Toledo Hospital challenged the MAC's decision to deny the capital DSH reimbursement following the effective date of the hospital's rural reclassification.  Toledo Hospital contended the Secretary's 2006 rulemaking was arbitrary and capricious because 42 C.F.R. § 412.320(a)(1)(iii), the rule upon which the MAC's denial relied, failed to "take into account" the relative costs of capital as required by Section 1886(g) of the Medicare Statute.  *Toledo Hosp.*, 621 F. Supp. 3d at 24.  The Court agreed, acknowledging that Section 1886(g) "requires the Secretary to 'take into account' variations in relative capital costs."  *Id.* at 30.

178.    In reaching its decision, the Court rejected the Secretary's argument that the agency had an "historic policy" of treating hospitals with acquired rural status as rural for capital payment purposes, instead concluding that the "regulatory history is unclear, and past practice cuts against the Secretary's contentions."  *Id.* at 26.  Notably, the Secretary conceded that "he 'did not address explicitly through rulemaking whether [rural reclassified] hospitals were eligible for Capital DSH until 2006.'"  *Id.*  As the sole support for the supposed historic policy, the Secretary relied on some errant cross-references between some of his regulations that changed over time.  *See id.* at 26-27.  Unpersuaded, the Court explained that to the extent that archeological cross-

references could establish a policy, a rulemaking in 2004 "removed the … cross-reference entirely, thereby eliminating any link between the capital DSH adjustments" and status as a rural reclassified hospital.  *Id.* at 27.

179.    The Court also rejected the Secretary's argument that the agency had a steadfast rule to treat geographic classifications within operating and capital payment systems the same.  *See id.* at 26-27.  Rather, according to the Court, no regulation "explicitly stated that the [rural] reclassification scheme was tied to capital DSH adjustments, or that classifications under the two schemes [operating and capital PPS] were uniform."  *Id.* at 27.  The Court's review of the regulatory history instead "reveal[ed] that the agency was concerned more with cost correlation between the operating and capital PPS, rather than classification consistency."  *Id.* at 28.

180.    The agency's "actual practice" was likewise unsupportive of the Secretary's position, with the Court noting that "at least one . . . reclassified rural hospital that requested the capital DSH adjustment received an adjustment."  *Id.*  In other words, in stark contrast with statements made by the Secretary in the rulemaking, the Court concluded that the Secretary had neither a policy nor a practice of denying capital DSH reimbursements to hospitals with acquired rural status.

181.    Finding no evidence of an agency policy or practice, the Court examined whether any evidence existed that the Secretary nonetheless considered "the relative costs of capital for hospitals, like Toledo Hospital, that had reclassified as rural . . . but are physically located in an urban area."  *Id.* at 29.  The record was absent of any "evidence that the agency took these costs into account, either in 1991, 2000, 2004, or 2006."  *Id.*  This omission was inconsistent with the statute, which instructs that the Secretary "must take relative costs 'into account' to some degree in determining adjustments to the capital PPS system."  *Id.* at 30.

182.    Accordingly, the Court held that the 2006 rulemaking that promulgated 42 C.F.R. § 412.320(a)(1)(iii) "was arbitrary and capricious. Thus, [42 C.F.R. § 412.320(a)(1)(iii)] is unreasonable and cannot be relied upon to deny . . . the capital DSH adjustment." *Toledo Hosp.*, 621 F. Supp. 3d at 30.

183.    Despite concluding that 42 C.F.R. § 412.320(a)(1)(iii) was arbitrary and capricious, the Court did not vacate the rule, because Toledo Hospital "[could] not directly challenge the rule under the APA because the six-year statute of limitations [had] lapsed." *Toledo Hosp.*, 621 F.Supp.3d at 30.  Instead, the Court could only "'hold unlawful and set aside [the] agency action' that [was] unlawful," *i.e.*, the application of the regulation to the plaintiff.  *Id.* (internal citation omitted).

184.    The Secretary initially filed a notice of appeal in the *Toledo Hosp.* case on November 29, 2021.  However, he ultimately relented and withdrew his appeal on December 30, 2021.  The decision in *Toledo Hosp.* is therefore the final, binding decision that directly determines the outcome of this matter as well.

185.    Subsequently, in response to the *Toledo* decision, the Secretary adopted prospective revisions to 42 C.F.R. § 412.320(a)(1)(iii) in its Fiscal Year 2024 Hospital Inpatient PPS Final Rule.  Medicare Program: Hospital IPPS Fiscal Year 2024 Payment Rates & Policy Changes, 88 Fed. Reg. 58,640, 59,117, 59,334 (Aug. 28, 2023).  Specifically, for discharges on or after October 1, 2023, hospitals reclassified as rural under § 412.103 will no longer be considered rural for purposes of determining capital DSH eligibility.  *Id.*  Instead, for purposes of § 412.320, the geographic classifications specified under § 412.64 will apply.  *Id.*  However, for the period under appeal, CMS and its contractors have and will continue to apply the 2006 regulation, denying capital DSH to the Plaintiffs for the periods at issue.

186.    For all the same reasons that the *Toledo Hosp.* court set aside the regulation as applied to the plaintiff in that case, so, too, here, the Court should set aside the regulation and instruct the Secretary to pay the Plaintiffs their capital DSH.

### COUNT III

### Violation of the Medicare Statute — Board Authority

187.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

188.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

189.    The regulation at 42 C.F.R. § 405.1873, which incorporates 42 C.F.R. § 413.24(j), expressly precludes the Board from determining the amount of total reimbursement due the provider because, if a provider does not claim the cost or file a protest item, "the specific item is not reimbursable, regardless of whether the Board further determines in such final hearing decision that the other substantive reimbursement requirements for the specific item are or are not satisfied." 42 C.F.R. § 405.1873(f)(1)(ii).  These provisions in turn could prevent a court from ordering payment if there is no protested item, which is contrary to provisions in 42 U.S.C. § 1395oo(f) that afford a provider the right to obtain judicial review of the Board's determination on total reimbursement due the provider or on any action resulting from a Board grant of EJR.

190.    The Secretary's regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 are contrary to the Medicare statute, because the regulations impermissibly constrain the authority granted by

42 U.S.C. § 1395oo(a)(1)(A)(i) to the Board to decide a provider's dissatisfaction with "the amount of total program reimbursement due the provider." *Id.* Nowhere in that statute is there a requirement that a provider must include a claim or a protested amount for a specific cost on its cost report before payment related to that cost can be addressed by the Board.

191.    For the reasons set forth above, the Court should strike down the regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 that expressly preclude the Board from determining the amount of total reimbursement due a provider as unlawful and contrary to the controlling statute at 42 U.S.C. § 1395oo.

## COUNT IV

### Arbitrary and Capricious Agency Action — Board Authority

192.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

193.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

194.    The regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 are arbitrary and capricious and an abuse of discretion and are, therefore, invalid. 5 U.S.C. § 706(2).

195.    Congress granted to the Board the authority to decide issues brought to it by providers related to "the amount of the total program reimbursement due the provider" and the court the authority to review such Board decisions. 42 U.S.C. §§ 1395oo(a)(1)(A)(i), 1395oo(f). The Secretary's regulations prevent the Board from deciding the amount of total program

reimbursement due the provider and the court from reviewing such decisions on appeal. When promulgating the regulation at 42 C.F.R. §§ 413.24(j) and 405.1873 the Secretary wholly failed to justify this break from the statute. *See Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776–77 (D.C. Cir. 2005). The Secretary did not even acknowledge that its regulation would have such an effect. 80 Fed. Reg. at 70551–65, 70603–04. Because the Secretary relied on factors that Congress has not intended him to consider and "entirely failed to consider an important aspect of the problem," the regulations are "arbitrary and capricious," as well as an abuse of discretion, and must be set aside under the APA. *See State Farm*, 463 U.S. at 43.

**COUNT V**

**Violation of the Administrative Procedure Act: Arbitrary, Capricious, an Abuse of Discretion, Otherwise not in Accordance with Law, in Excess of Statutory Authority and Unsupported by Substantial Evidence – Board's Finding that Mayo Clinic Eau Claire in Case No. 25-0191GC Failed to Comply with 42 C.F.R. § 413.24(j)**

196.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

197.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, …in excess of statutory jurisdiction, authority or limitation, [or] unsupported by substantial evidence." 5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

198.    The Board acted arbitrarily and capriciously, inconsistent with the law and in a manner unsupported by substantial evidence when it determined that Mayo Clinic Eau Claire, Provider No. 52-0070 in Case No. 25-0191GC, did not comply with the substantive claim requirements at 42 C.F.R. § 413.24(j). Although Plaintiffs contest the validity of the substantive

claim requirements, they assert that Mayo Clinic Eau Claire did in fact meet those requirements by claiming the capital DSH cost at issue as a protested cost, consistent with the court's decision in *Toledo Hosp.,* 621 F. Supp. 3d 13 and CMS's subsequent adoption of revisions to the capital DSH regulation in its Fiscal Year 2024 Hospital Inpatient PPS Final Rule. 88 Fed. Reg. at 59,117, 59,334. The Board's decision to the contrary is unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion, not in accordance with law and in excess of statutory authority.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request an Order:

1.    Declaring that the Secretary's regulation at 42 C.F.R. § 412.320(a)(1)(iii) is unlawful and must be vacated or, in the alternative, set aside as it relates to the Plaintiffs;

2.    Declaring that that the Plaintiffs are physically located in urban areas and therefore qualify for capital DSH payments, notwithstanding their acquired rural status;

3.    Declaring that the Secretary's regulations at 42 C.F.R. §§ 412.24(j) and 405.1873 that deny the Board's and Court's authority to decide appeals related to total program reimbursement paid to providers for issues not protested or claimed by providers are unlawful and must be vacated or, in the alternative, set aside as they relate to St. Joseph Medical Center in Case No. 24-2564GC and Mayo Clinic Eau Claire, Mayo Clinic Mankato, Mayo Clinic La Corsse, Mayo Clinic Rochester, Mayo Clinic Arizona, and Mayo Clinic Florida in Case No. 25-0191GC.

4.    Declaring invalid the Board's decision that Mayo Clinic Eau Claire, Provider No. 52-0070 in Case No. 25-0191GC, failed to comply with the substantive claim requirements at 42 C.F.R. § 413.24(j) and remanding Mayo Clinic Eau Claire's claim to the Board with instructions that the Board promptly make full payment for Mayo Clinic Eau Claire's capital DSH costs at issue, to include interest;

5.      Requiring the Secretary to recalculate Plaintiffs' capital DSH for the years under appeal;

6.      Awarding Plaintiffs their costs and fees incurred in this litigation to the extent permitted by law; and,

7.      Requiring the Secretary to pay Plaintiffs interest on the payments resulting from the Court's orders, pursuant to 42 U.S.C. § 1395oo(f)(2);

8.      Granting such other relief in law and/or equity as this Court may deem just and proper.

Dated: January 21, 2026

Respectfully submitted,

/s/ *Leslie Demaree Goldsmith*
Leslie Demaree Goldsmith
(DC Bar #422759)
Sarah B. Miller
(DC Bar #997286
BASS, BERRY & SIMS, PLC
1201 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20004
Telephone: (202) 827-7083
leslie.goldsmith@bassberry.com
smiller@bassberry.com

*Attorneys for Plaintiffs*

49000834